Filed 11/21/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO CARLOS IBARRA,<br><br>    Defendant and Appellant. | D084309<br><br><br><br>(Super. Ct. No. SWF1807625) |


APPEAL from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge.  Affirmed in part; reversed and remanded with instructions in part.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Francisco Carlos Ibarra guilty of the attempted murders of A.U. and R.M. and two counts of attempted robbery.  Defendant contends on appeal that the trial court prejudicially erred:  (1) by instructing the jury on a "kill zone" theory of attempted murder liability because there was no evidence that Ibarra knew R.M. was present during the shooting; (2) by

failing to instruct the jury as to self-defense or imperfect self-defense; and (3) by imposing consecutive sentences for the convictions for attempted murder and robbery. We agree that the evidence did not support the kill zone instruction, and therefore we reverse the conviction as to count 2. Otherwise, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Charges, Conviction and Sentence

Ibarra was charged in a second amended information with the willful, deliberate and premeditated attempted murder of A.U. (count 1); the willful, deliberate and premeditated attempted murder of R.M. (count 2); taking of property from A.U. by force and fear, including an allegation of infliction of great bodily injury on A.U. (count 3); and the taking of property from R.M. by force and fear, including an allegation of infliction of great bodily injury on R.M. (count 4). The information included allegations of aggravating factors and alleged that Ibarra was armed with a firearm and discharged the firearm during the offenses. It also alleged prison priors of Ibarra.

The jury convicted Ibarra of both counts of attempted premeditated murder and found true the arming allegations, but found not true the allegations that he personally discharged a firearm or that he personally inflicted great bodily injury on A.U. The jury also found Ibarra guilty of two counts of attempted robbery (a lesser included offense of count 3 and count 4).

The court sentenced Ibarra to seven years to life, plus an additional consecutive year for the enhancement on count 1; seven years to life, plus an additional consecutive year for the enhancement on count 2; two years, plus one consecutive year for the enhancement on count 3; and eight months, plus a consecutive four months for the enhancement on count 4. The court ordered that the sentence on count 1 would run consecutively to count 3

2

(which it deemed to be the principal count), count 2 would run consecutively to count 1, and count 4 would run consecutively to count 2. The total sentence was a determinate sentence of six years plus an indeterminate sentence of 14 years to life.

Ibarra timely appeals.

## B. Evidence at Trial

A.U. was the owner of a piece of rural property that he used for the illegal cultivation of marijuana. R.M. worked for him on the property and stayed on the property. The property included an old, poorly built, small wooden shed.

During the late morning on the date of the offense, A.U. and R.M. were on the property. R.M. was napping on the floor of the shed and A.U. was outside drinking a beer when a pickup truck came through the gate of the property. R.M. got a quick glance at the truck as it entered the property. The truck stopped and two or three people, including Ibarra, immediately got out of the truck. They were wearing black clothes and black ski masks that covered their faces.

A.U. was frightened and immediately ran into the shed. He shut the door to the shed and told R.M. that the people in the truck were going to rob them. Someone screamed in Spanish, "you son of a bitch get out right now," and A.U. screamed, "take everything and go!" Seconds later, the people started shooting at the shed. A.U. testified that "they couldn't see us [because] [w]e were inside the shed." The gunfire did not stop while A.U. and R.M screamed at the shooters. A bullet hit and severed A.U.'s arm. A.U. was also struck multiple times in his chest, his back and his wrist, in quick succession. R.M., who had dropped back to the floor, was shot in the back. While the shooting continued, A.U. and R.M. were able to flee the shed

3

through the shed's window on the opposite side from the shooters. A.U. ran and R.M. crawled to the fence line of the property to escape.

R.M. testified that he never had any face-to-face interaction with the shooters and did not see them. He further testified that he did not have any knowledge that the shooters would have known that he was in the shed.

R.M. testified that A.U. had a .22 caliber rifle at the property but it was not in the shed, and neither he nor A.U. fired it during the shootings. It may have been in R.M.'s vehicle, a white Honda, during the shooting. There were shell casings from a .22 caliber rifle found near the Honda.

## DISCUSSION

### A. The court erred in instructing the jury as to "kill zone" to establish his concurrent intent to kill R.M.

As noted above, Ibarra was charged and convicted on count 2 for the attempted murder of R.M. The offense of attempted murder requires a specific intent to kill. (*People v. Mumin* (2023) 15 Cal.5th 176, 191 (*Mumin*).) An intent to kill one person does not transfer to an intent to kill surviving victims, but a person can be liable for attempted murder of surviving victims under a theory of concurrent intent, also known as the kill zone. " 'Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Id.* at p. 192, quoting *People v. Bland* (2002) 28 Cal.4th 313, 329–330.) This is because the defendant intends to kill the primary victim and concurrently intends to kill all those in the zone of harm. (*Mumin*, at pp. 191–192.)

"[A] kill zone is an area which a defendant intentionally creates in order to kill all those within it to ensure the primary target's death." (*Mumin, supra*, 15 Cal.5th at p. 193.) Under the kill zone theory, there must

4

be evidence that the defendant intended to create a zone of fatal harm, and the victim was within that zone. (*Ibid.*)

At Ibarra's trial, the court instructed the jury with CALCRIM 600 (attempted murder), including the portion of the instruction that describes the relationship between the intent to kill A.U. and the concurrent intent to kill R.M., i.e., the kill zone:

> "A person may intend to kill a primary target and also secondary targets within a zone of fatal harm or kill zone. [¶] A kill zone is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target. [¶] In order to convict the defendant of the attempted murder of [R.M.], the People must prove that the defendant not only intended to kill [A.U.] but also either intended to kill [R.M.] or intended to kill everyone within the kill zone."

Ibarra contends on appeal that there was insufficient evidence to support the jury instruction on the kill zone theory of attempted murder liability because there was no evidence that Ibarra knew that R.M. was inside the shed when he and the other shooters fired on it.

On review, we determine independently whether substantial evidence supported the instruction. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.) We review an instruction on the kill zone theory to determine "whether substantial evidence had been presented to support a reasonable inference by the jury 'that defendant[] intended to create a zone of fatal harm around a primary target.' " (*Mumin, supra,* 15 Cal.5th at p. 203, quoting *People v. Canizales* (2019) 7 Cal.5th 591, 610.) " '[I]t is error to instruct . . . on a theory that is entirely unsupported by the evidence.' " (*People v. Medina* (2019) 33 Cal.App. 5th 146, 154 (*Medina*), quoting *People v. Burnett* (1992) 9 Cal.App.4th 685, 690.)

5

In *People v. Canizales* (2019) 7 Cal.5th 591, 608, our Supreme Court issued a clear warning to trial courts about the use of the kill zone instruction: "We emphasize that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate. Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction."

Here, we conclude that there was insufficient evidence to support the kill zone instruction because, as we explain below, Ibarra could not have had a specific intent to kill R.M. if there was no evidence that he was aware of R.M.'s presence in the kill zone.

If Ibarra had been aware of R.M.'s presence in the shed, there would have been sufficient evidence for the jury to conclude that A.U. was Ibarra's primary target and that the small shed constituted a kill zone. The shooters opened fire on the shed after A.U. saw them, became frightened, and ran inside the shed. Ibarra does not contend otherwise.

But Ibarra correctly points to the dearth of evidence that the shooters would have known that R.M. was in the wooden shed (or anywhere on the property). R.M. was napping on the floor of the shed when Ibarra and the other shooters drove through the gates of the rural property and jumped out of the truck, wearing black tactical gear and black ski masks. They saw A.U.

6

run into the small shed, and after screaming at A.U., they opened fire. Although there is some confusion in the evidence as to when and for how long the shed door was open, R.M. testified that although he got a glimpse of the truck through the sole window in the shed, he never saw the shooters; and likewise, there was no evidence that Ibarra saw or could have seen R.M. in the shed. There was testimony that both A.U. and R.M. called out for Ibarra and the others to stop shooting, but there was no evidence that Ibarra could or did hear the calls of R.M. over the din of the shooting.

In distinguishing between the doctrine of transferred intent for a completed murder and the doctrine of concurrent intent for an attempted murder, the *Mumin* court noted:

> "While the intent to kill one target transfers to others actually killed, the doctrine will not extend that lethal intent to others who may be assaulted or injured but do not die. To be guilty of the attempted murder of a person who survives, *the defendant must intend to kill that survivor*. [Citation.] It is essential to keep clear the distinction between the sufficiency of implied malice to support a murder conviction when the victim dies and the requirement of a specific intent to kill in order to support a charge of attempted murder when the victim survives." (*Mumin, supra,* 15 Cal.5th at p. 191, italics added.)

The *Mumin* court quoted *Bland* to highlight the important distinction between transferred intent for a completed murder, and specific intent for an attempted murder:

> " 'Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so,

7

is guilty of the attempted murder of the intended victim, but not of others.' " (*Mumin, supra,* 15 Cal.5th at p. 191, quoting *Bland, supra,* 28 Cal.4th at p. 328.)

The kill zone theory acknowledges this distinction and allows a jury to find that a defendant intended the attempted murder of the person the defendant is attempting to kill (the target), and, concurrently, that the defendant also intended to kill others in the vicinity (the kill zone) in the pursuit of the target. (See, e.g. *Bland, supra,* 28 Cal.4th at pp. 330–331 ["Even if the jury found that defendant primarily wanted to kill Wilson rather than Wilson's passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers."].)

But it is not possible to intend to kill someone in the vicinity of a target if the attacker has no knowledge that the person is present. It cannot be said that such a defendant "intend[ed] to kill *that survivor*," *Mumin, supra,* 15 Cal.5th at page 191 (italics added). *Mumin*'s conclusion that, "[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else" cannot be reconciled with a finding of intent to kill by a defendant who is unaware of the presence of "someone else." (*Ibid.*) For that reason, we conclude that in the absence of Ibarra's awareness that anyone else was present in the shed with A.U., it cannot be said that Ibarra intended to kill R.M. concurrently with his intent to kill A.U.

At least one case has held to the contrary. In *People v. Adams* (2008) 169 Cal.App.4th 1009 (*Adams*), the defendant had been convicted of the attempted murder of three people who were present in the house that she had ignited but who managed to escape from the blazing house. A fourth person, her target, died in the fire. Defendant argued that she did not know

the attempted murder victims were at home when she committed the arson and therefore there was no evidence that she intended to kill them. Accordingly, Adams claimed that the jury should not have been instructed on the kill zone theory of intent in support of the attempted murder charges.

The *Adams* court rejected that claim. It concluded that "the concurrent intent doctrine permits a rational jury to infer the required express malice from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm." (*Adams*, *supra*, 169 Cal.App.4th at p. 1023.) Adams targeted the murder victim inside her home. "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm." (*Ibid.*) The court explained its view that the kill zone theory "imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die." (*Adams*, at p. 1023.)[1] But a defendant's awareness of the "natural and probable consequences" of a

---

11    In *Medina, supra*, 33 Cal.App.5th at p. 155, the court rejected *Adam*'s conclusion that a kill zone instruction is proper "if a defendant recognizes (or accepts the fact) that a natural and probable consequence of his or her act toward the primary target would be that anyone (as opposed to everyone) within the zone of harm could or would die." The *Medina* court stated that "we respectfully disagree with this view, which we believe replaces the specific intent/express malice required for an attempted murder conviction with conscious disregard for life/implied malice, which *Bland* makes clear cannot support an attempted murder conviction." (*Ibid.*) *Medina* disapproved the use of a kill zone instruction where the evidence did not show that the defendant had a primary target. (*Id.* at p. 156.)

9

dangerous act is not the equivalent of acting with intent to kill a specific person.

We further note that *Adams* involved the arson of a victim's residence by a defendant who was acquainted with the victim and her family. It may be a reasonable inference that a nighttime fire at a residence would kill the home's residents beyond the targeted person. (See also *People v. Vang* (2001) 87 Cal.App.4th 554, 564 ["defendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings"].) In contrast, here, it is not reasonable to infer that defendants knew that R.M. would be napping on the floor of the small, dirty wooden shed in broad daylight. Because we disagree with the *Adams* court's rationale and because *Adams* is distinguishable on its facts, we decline to follow it here.

Thus, because the evidence was insufficient to show that Ibarra had been aware of R.M.'s presence in the shed, we conclude that it was improper to instruct the jury on the possibility that he concurrently intended to kill R.M., and therefore the court erred when it instructed the jury with the kill zone instruction as set forth in CALCRIM 600.

**B. The court did not err in declining to instruct the jury as to self-defense and imperfect self-defense**

Ibarra argues that the court erred in refusing to instruct the jury as to self-defense and imperfect self-defense. Trial counsel cited the forensic testimony that shell casings from a .22 caliber rifle were found near R.M.'s Honda in arguing in support of a self-defense instruction: "I think the evidence supports the proposition that upon arrival by the defendants that [A.U.] went to the Honda, pulled out the .22, fired one shot on one side of the car leaving a shell casing there, fired a shot on the other side of the car

10

leaving other evidence there, i.e., another shell casing, and that started off the whole event."

Self-defense is an affirmative defense, establishing justification for the defendant's conduct such that the conduct is not unlawful. (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1154.) "[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).) Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) An attempted killing based upon an unreasonable belief in the need for self-defense obviates malice, which requires an actual belief that the lethal act was necessary to avoid death or serious bodily injury. (*People v. Beltran* (2013) 56 Cal.4th 935, 951.) Thus, an attempted killing committed because of an unreasonable belief in the need for self-defense is attempted voluntary manslaughter, not attempted murder. (*People v. Elmore* (2014) 59 Cal.4th 121, 129.) This doctrine requires that the defendant have an actual belief in the need for self-defense to avoid imminent danger to life or great bodily injury. "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." (*Manriquez*, at p. 581.)

Here, trial counsel requested the instructions as to self-defense and imperfect self-defense, but the court declined to give them.

A trial court must instruct the jury on a theory of the defense, including a lesser included offense, if there is substantial evidence to support the defense theory. (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Rather, the evidence must be of a quantum or quality that the court

11

has described, variously, as "evidence that a reasonable jury could find persuasive" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8) or "evidence . . . 'substantial enough to merit consideration' by the jury." (*Breverman*, at p. 162). "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Simon*, at p. 132.)

We review a trial court's failure to instruct on a defense theory de novo and view the evidence in the light most favorable to the defendant in doing so. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137; *Manriquez, supra,* 37 Cal.4th at p. 584.) A lesser included offense instruction is required when supported by substantial evidence, meaning a reasonable jury could conclude that the lesser offense, but not the greater, was committed. (*Millbrook*, at p. 1137.)

Here, Ibarra engages in a speculative leap of logic when he argues that the presence of certain shell casings outside the shed means that A.U. shot at the shooters before they unleashed the barrage of bullets on him, causing Ibarra to fear for his own safety. No one testified that A.U. was armed during the assault or that he shot at anyone. A.U. and R.M. testified to the contrary. The presence of shell casings, unconnected to any weapon recovered after the melee, is insufficient to change the defense speculation into evidence substantial enough to justify the requested instructions. (*Simon, supra,* 1 Cal.5th at p. 132.)

Further, even if the jury could believe that A.U. was able to get two shots off in Ibarra's direction before he took shelter in the shed, there was no evidence from which the jury could have concluded that Ibarra had either an actual belief in the need for self-defense to avoid imminent danger to life or great bodily injury, or an unreasonable belief as to that need. Ibarra was

12

among a group of heavily armed individuals wearing body armor and masks, i.e., a group that outnumbered and vastly outarmed A.U. and R.M. A.U. could not have posed any imminent danger to Ibarra. Thus, it cannot be said that there was sufficient evidence of self-defense or imperfect self-defense to justify instructions on such putative defenses to the jury.

Moreover, as respondent notes, "a defendant who—through his own wrongful conduct, such as initiating a physical assault or committing a felony—has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke unreasonable self-defense." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834; see also *People v. Enraca* (2012) 53 Cal.4th 735, 761.) Here, by converging upon the farm with a group of armed and masked intruders, Ibarra's own wrongful conduct precludes a self-defense or imperfect self-defense instruction, even if there had been substantial evidence that A.U. had shot the .22 caliber rifle twice at the intruders, as theorized by the defense.

## C. The court did not err in declining to stay imposed sentences

Appellant argues that the court erred in imposing consecutive sentences as to all four counts because the attempted murder of A.U. occurred while the attempted robberies were still in progress, and therefore the court should have stayed the sentences for the robbery convictions, counts 3 and 4, pursuant to Penal Code section 654.[2] Appellant further argues that Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441 (Assembly Bill 518) is retroactive and allows the court to exercise its discretion in choosing a longer or shorter sentence, but the trial court here did not acknowledge its discretion.

---

[2] Further unspecified statutory references are to the Penal Code.

As amended, section 654 subdivision (a) says: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

As our Supreme Court has explained: "Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.] 'The proscription against double punishment . . . is applicable where there is a course of conduct which violates more than one statute and comprises an indivisible transaction punishable under more than one statute. . . . The divisibility of a course of conduct depends upon the intent and objective of the actor.' " (*People v. Miller* (1977) 18 Cal.3d 873, 885). " '[I]f all the offenses are incident to one objective, [then] the defendant may be punished for any one of them but not for more than one.' " (*Ibid.*)

"[S]o long as some substantial evidence to support the implied finding exists, there can be no reversal." (See *People v. Cohen* (1951) 107 Cal.App.2d 334, 341.). Where, as here, the court made no express findings on the issue, a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Some courts have held that an attempted murder committed during a robbery is incidental to the robbery, and therefore section 654 precludes double punishment. (See *People v. Lowe* (1975) 45 Cal.App.3d 792, 795 [murder and attempted murder were incidental to the robberies of the victims].) However, "gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654." (*People v. Nguyen* (1988) 204

14

Cal.App.3d 181, 190.) As the court noted in *Nguyen*, section 654 "should not[] be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense. Once robbers have neutralized any potential resistance by the victims, an assault or attempt to murder to facilitate a safe escape, evade prosecution, or for no reason at all, may be found by the trier of fact to have been done for an independent reason." (*Nguyen*, at p. 191.)

Here, substantial evidence supports the trial court's implicit finding that the attempted robbery and attempted murders were divisible. A.U. and R.M. put up no fight at all inside the shed, and yet for reasons known only to the assailants, the shooters chose to shoot repeatedly into the shed, a choice that did nothing to advance their attempt to rob the farm. The excessive violence was completely gratuitous, and A.U. and R.M. offered no resistance, and therefore the trial court had substantial evidence to conclude that the murder attempts were distinct from and not incidental to the robbery attempts.

As Ibarra argues, Assembly Bill 518 amended section 654 such that it "now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) Because we conclude that the court did not err in imposing consecutive sentences, we need not reach the issue as to whether the court properly exercised the discretion that it would have had if it had stayed one or more of the counts.

15

DISPOSITION

The judgment is affirmed in part and reversed in part.  The jury's verdict on count 2, the attempted murder of R.M., is vacated and the matter is remanded to the trial court with directions to:  (1) give the People 60 days from the date of the remittitur to file an election to retry Ibarra on the vacated count of attempted murder; (2) either conduct a new trial on the attempted murder of R.M. if the People so elect or dismiss count 2 if the People do not elect to retry it; and (3) resentence Ibarra.  In all other respects, the judgment is affirmed.  Following the conclusion of proceedings on remand, the trial court shall amend the abstract of judgment as necessary and forward copies of the amended abstract to the Department of Corrections and Rehabilitation.


                                                                                                KELETY, J.

WE CONCUR:


HUFFMAN, Acting P. J.


RUBIN, J.


16